The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the time will be as allotted to counsel. The first case today is United States v. Joel Jared Encarnacion, appeal number 21-1165. Attorney Arkin, please introduce yourself for the record and proceed with your argument. Thank you so much. May it please the court, my name is Attorney Murad Arkin and I'm grateful for the opportunity to appear for the first time before Your Honors in the First Circuit Court of Appeals. If I might, Your Honors, I'll first address the issue of the suppression of the wire tap affidavit contained information regarding one seizure of drugs that occurred in May, on May 1st of 2018, three months and one day before the wire tap issued. The question then became, Your Honors, whether or not the affidavit contained information sufficient to establish a continuing pattern of criminal conduct or whether that single transaction was not revived in any meaningful way. We submit respectfully, Your Honors, that the information that the government presented in its wiretap application failed to corroborate in any meaningful way the existence of an ongoing continuing pattern of criminal conduct. What we have, Your Honors, is I believe four sources of information that were referenced in the wiretap affidavit. The in terms of the seizure, as they indicated, that was on May 1st and involved CS1. Following that seizure, there was another tip from a cooperating defendant, cooperating defendant two, and cooperating defendant number two, the information from that individual was, I would argue, merely perpetuation of rumor and not the sort of thing that revived the tip from May 1st of 2018. And as I indicated in my briefing, there was reason to doubt the veracity of CD2, who claimed to have known Jevito or Suazo, the subject of the wiretap, his whole life but failed to identify him or his spouse from pictures. The remaining three tips that were that were furnished, Your Honors, related to a source of information one, who provided information in August of 2016, and cooperating defendant one, who provided information from December of 2017. And none of that information was idiosyncratic or in any way sort of was comparable to what I think this court found sufficient in the Schaefer case in terms of interlocking tips, confirming specific details. Instead, it was really more in the neighborhood of mere perpetuation of rumor. The validity of the information doesn't depend so much on how often it's repeated, but whether or not there's reason within the particular tips to authenticating and verifying information. And so we argue, Your Honors, that there was insufficient evidence to believe that, apart from that one transaction occurring three months before, that there was an ongoing drug distribution enterprise. I guess, in my mind, I think of it similar to, you know, a Bigfoot sighting. I mean, there have been 4,500 Bigfoot sightings in this country since that data has been recorded. And just because we've heard a lot about Bigfoot doesn't, I think, establish that Bigfoot exists. It's the same in this case. There might have been a lot of rumors about this person, Javito, but without the specific details that would be, you know, similar to the Schaefer case, I would suggest that the government showing there was wanting. The other issue, Your Honors, with respect to the wiretap warrant in this case was whether or not the government established necessity. And our position is that the government sets such lofty goals for its investigation that, under any sort of set of circumstances, those goals could only be accomplished by way of a wiretap. And how are the goals in this case different than the goals in cases where we've approved the wiretap affidavit, such as Gordon? Yes, Your Honor. I think that I was hopefully prepared to answer that question, Judge Celia. In Santana Doan's, for example, the wiretap application requested information about, or set as a goal, discovering the sources, delivery means, storage locations, and distribution methods for the narcotics, locating resources used to finance the trafficking, and determining how the conspiracy invested in one of the drug proceeds. The other cases, again, are similar. The goals are high, but not as unattainable as they were in this case. And I think that, Judge Celia, what I would say... Well, you still haven't told me how they differ. I beg your pardon, Your Honor. I believe in our case, the goal was uncovering, quote, the full scope of crimes committed by persons yet unknown and their criminal associates. Five minutes remaining. Five minutes. So, in our case, I think that none of the cases that exist in the First Circuit reach that level of loftiness that exists in this particular case, in terms of the full scope of crimes committed by persons yet unknown and their criminal associates. That includes the universe of, potentially, all criminals anywhere and everywhere, and I think was plainly broader than what was authorized in other matters. And so, if that satisfies the court with respect to that issue, I would submit that comparing that sort of vast dragnet to the more limited cases in the First Circuit is as positive of this particular issue. I think it bears noting, Your Honor, that, you know, in fact, we're dealing with the circumstance here, where this wiretap captured an individual who was on nobody's radar screen anywhere, and, you know, and I'm referring specifically to Mr. Encarnacion. There were no CI tips about him. There was no investigation related to him at all. Yet, he fell into this very broad dragnet, and I use that, simply, Your Honor, as an example of how broad this was. Mr. Erkin, just conceptually, it strikes me that the two arguments you are making are related. That, as to the second argument, a broad and lofty statement of goals, of course, takes place in the context of the specific, in this instance, drug conspiracy that the government says it's investigating. So, one, it's tied to the specific object, and two, going back to your first point, if you are wrong on the first point, and there was adequate suspicion, it would seem to me that both of those act as limiting principles on your second argument. In other words, at an abstract level, there is a point to what you're arguing, but if you actually look at the context of this case, the point sort of dissolves. So, could you perhaps, you know, looking at that the warrant ought to be viewed through the lens of this particular drug conspiracy, but I think that the language ought to have been tailored more to avoid circumstances where the goals would include identifying ad nauseam and ad infinitum any individual who might thereafter be connected to however many degrees of uncertainty to this investigation. So, you know, if we're saying this, identify the source of supply for Javito, great, I mean, that makes sense. Identify Javito's customers, that makes sense. But they didn't limit it there, they limited it to, you know, all the full scope of the activities of criminals known and unknown. And I think that that, Your Honor, I would respectfully suggest was the problem with this and made it overly broad. If the court would permit, perhaps I can then move to the issue of the, of juror number four being excluded. In the jury selection process, we actually had a, I think, a somewhat robust panel of jurors who expressed opinions, which I think were timely and relevant to the issues that were to be judged in this particular case. And there were, I think, three jurors that expressed varying degrees of skepticism of, you know, police testimony. One was struck by the court and the two remaining jurors were struck by the government, using prompting challenges. And we argue that the court ought not to have stricken juror number four, juror number four expressed doubt about whether she could decide the issues fairly. Isn't that correct? Well, I think that the question is whether or not her... Wait, why don't you answer my question? Okay, sure. Didn't she express such doubt? Slight reservations, Your Honor. Well, we're not talking about reservations in the sense of hotel reservations. We're talking about reservations meaning doubts. Yes, yes, for sure, for sure. But I think that's Okay. And so on what basis can we fault the district judge for not going forward with the juror who expresses doubts about her ability to decide a case fairly? Sure, but so I think jurors should be free to express themselves and explain sort of what's going through their mind. But the question is that juror can then fairly decide the issues in the case. And can I interrupt and just ask you, what rule are you asking us as a court to adopt then, when it appears that the district court judge here sat, listened to the questioning and came to her own conclusion that this juror's preconceived opinion should disqualify her? I can't imagine what rule we would come up with that would overturn the judge's discretion in this particular case. Great question, Your Honor. And the rule ought to be whether the juror could not be impartial toward the evidence. And I think that what happens here is we're dealing with... And I cited to a Massachusetts case from the trial court dealing with a similar issue, the Williams matter. Of course, you know, different jurisdiction, but the principle is the same. Having skepticism of police is not a disqualifying factor. This juror should not... We're not talking about skepticism of police. We're talking about a juror who says that she has doubts about her ability to decide the case fairly. The court might view her doubts not as an inability to decide the case fairly, but an inability to set aside her skepticism of police. That's why the standard is abuse of discretion. We have to rely on the district judge to interpret that statement in the context of the voir dire, and that's exactly what Judge Burroughs did. Right. So, of course, you have to allow the judge to call balls and strikes. But I think that we went beyond the view that police should not be trusted, you know, implicitly based on their badge of office, and perhaps she'd be distrustful to some extent because of their badge of office. Having a reservation about that makes this person a robust juror, not an unfair or impartial... Not an unfair or partial juror, Your Honor. I think that we have to be mindful... I saw Your Honor cheek your head there, so I'll conclude that point. But we certainly have to be mindful of the fact that a cross section of the community does include jurors who believe that police may not be as trustworthy as they ought to be, and that juror should have been sat on this jury, Your Honor. But I certainly do not want to detract from the points that the court has made in that regard. I see that I might be out of time. Well, in any event, thank you, Mr. Erkan. We'll hear from the government now. Thank you so much. It was a pleasure to meet all your honors. Thank you. Thank you, Attorney Erkan. If you could please mute your audio and your video, and Attorney Eisenstadt, if you could introduce yourself on the record to begin. May it please the court, Karen Eisenstadt for the government. Unless the court has a different preference, I was going to just touch on the four claims that the defendant made in the order that they were raised in the briefing. First, he challenges the sufficiency of the wiretap affidavit for Mr. Suazo's phone, and Mr. Suazo, again, is this defendant, Mr. Encarnacion's co-conspirator. The information in that affidavit was not stale because when viewed in its totality, provided what the district court correctly found was ample probable cause to believe that Mr. Suazo was involved in an ongoing drug trafficking enterprise. There's the May 1 deal for one kilogram of fentanyl, which was clearly a supply amount for distribution, which had all the hallmarks of an ongoing enterprise rather than a one-off transaction. That was just a few months prior to the affidavit. There's the 2017 prior wiretap of an international cartel that was smuggling drugs into the country from other countries in which Suazo was both mentioned and intercepted, talking about smuggling a large amount of fentanyl into the country. And then we have four, in addition, four separate human sources of information that are giving the government facts consistent with the same inference. Suazo is a high-level dealer. He can move kilo-sized amounts of drugs, including cocaine and fentanyl. Encarnacion also challenges the government's statement of necessity in the wiretap affidavit, but here he doesn't, I think, as the courts noted in its questioning of Mr. Erkin, the defendant doesn't wrestle with the fact that the goals stated in this wire affidavit were very similar to goals that this court has previously approved and called in the Santana-Jones case, the quote, meat and potatoes of drug trafficking investigations. So where it's known that the defendant, the target here, Mr. Suazo, does have an existing enterprise for drug trafficking, looking at things like the defendant's suppliers, associates, locations, financing, those same types of goals previously approved by this court. Go ahead, Judge Warren. So I have a few concerns about the breadth of the articulated goals if they were disassociated from the particular crime being investigated, the full scope of all criminal activity, including all persons known and unknown. Is this boilerplate that the U.S. Attorney's Office is now beginning to use? Because if it is, you may want to rethink that. I think what Your Honor pointed out in questioning Mr. Erkin is exactly correct in how to interpret wiretap affidavits. No, no, you are totally missing my point. Understood. So, for example, I don't know the answer to your question as to whether this is boilerplate. I don't think so, but, you know, how it is phrased. But I think in reading, a practical reading of this affidavit is that what is meant by that refers to, you know, the extensive investigation that had already occurred. There are certain known targets that are named. Under Title III, there are certain enumerated offenses that the government says we have probable cause to believe are occurring. And so the investigation does focus on finding the parameters of sort of the known identified drug traffic enterprise and not simply all drug crimes that could be occurring writ large. So I think it is tied to the level of detail in the affidavit about what drug organization is actually being investigated here. Largely, you are repeating the point I made, but you're not addressing my larger concern, especially when you say that this was an international drug cartel. So that sort of perhaps not wise of the government to be using that breadth of language in cases like this. The point is to give the judge who is reviewing the wiretap authorization a basis to conclude that there is adequate evidence to justify the wiretap and meet the necessity requirement. Understood, understood. And just to clarify, when I referenced international cartel earlier, that was with respect to a prior investigation of a different organization. So that was a prior wiretap in 2017. With respect to this particular investigation, it was actually with respect to a Boston-based enterprise that Mr. Suazo was running with locations in Chelsea, Lynn, etc. So it was, I think, much narrower than the international cartel that had been investigated by the Dominican authorities in 2017. So I just wanted to separate those two. Okay, Judge Selye had a question. Well, essentially, my question was the same as yours, Judge Lynch, but I'm still not sure that Ms. Eisenstadt has grasped the real point. Whether or not this language passes muster in the specific context of this case, you would be doing the service to your office if you would call to the attention of the appropriate people in the U.S. Attorney's Office that there are dangers inherent if anyone is of the opinion that this is standard language that should be routinely employed. Understood. Because it does open up a can of worms. Ms. Eisenstadt, I'm not quite sure you have understood. I want to reinforce Judge Selye's point. We don't know whether this is peculiar to the local office or whether this is something that is nationwide. If it is nationwide, then our concerns need to be brought to the attention of the Department of Justice in Washington. Have we been clear? Yes, absolutely. Thank you. Moving on, he also challenges the District Court's striking of Juror No. 4, which this Court did discuss with Mr. Erkin. Here, the juror was struck for cause because when pressed, she couldn't say for sure she could decide this case impartially, which is not an abuse of discretion by the District Court. He also raises a challenge to expert testimony by Agent Tully, who was not involved in this investigation regarding interpreting certain drug language, coded drug language, in the wiretapped calls. Here, he ignores the fact that this Court has approved similar expert testimony in prior cases, implicitly finding that the same methodology here, training and experience, is sufficiently reliable under Daubert in this type of field, drug trafficking, which is, of course, not an academic field, but what this Court has called a rough-and-ready field in which experience may be the best teacher. Finally, he also challenges the admission of the first four wiretapped calls. So, there are five calls, the fifth of which he doesn't challenge the admission. As to those calls, there were the same two co-conspirators on the phone having what was effectively a continuing conversation over the course of a little over a month about how to make money in their scheme. So, these later conversations referred back to the earlier conversations, assumed certain facts of prior discussions that they had had. These calls were part of the necessary description of the events leading up to the crime. And to the extent any of the calls sort of fall out of that bucket, they clearly did have special relevance to helping the jury understand the relationship of mutual trust between these two co-conspirators. And they also passed muster under the balancing test of Rule 403, especially given this Court's deferential standard review under Rule 403 to the District Courts, you know, on the spot weighing of probative value versus undue prejudice. But as I understood your brief, your basic point is that the latter calls were intrinsic to the conspiracy. That's correct. And that the calls were intrinsic to the conspiracy. If you read the calls together, they're essentially discussing an overarching conspiracy or scheme of which the charged conduct on September 17th and 18th with respect to the cocaine was a part. Part and parcel of sort of that overarching scheme that these two men had together. So, the calls were really part of the necessary description leading up to the events that were charged here. Thank you. Thank you. If the Court has no further questions, the government does rest on its brief. Thank you. That concludes argument in this case. Attorney Erkin and Attorney Eisenstadt should disconnect from the hearing at this time.